FINGERLE v CITY OF ANN ARBOR

Docket No. 310352. Submitted June 5, 2013, at Lansing. Decided
December 2, 2014, at 9:10 a.m. Leave to appeal sought.

Lawrence Fingerle brought an action in the Washtenaw Circuit Court
against the city of Ann Arbor and American Fire and Casualty
Company, seeking damages for flooding that occurred when rainwa-
ter entered the basement of his home through a large egress window
after an intense rainstorm in June 2010. The neighborhood had been
prone to flooding and Ann Arbor had built drainage infrastructure in
the area in the early 1990s. Although the infrastructure helped to
reduce the amount of rain-caused flooding, flooding continued to
occur in the 1990s and 2000s. Plaintiff claimed that he was unaware
of the risk of flooding. In 2002, plaintiff built a finished basement
with a large egress window directly across from a private retention
basin that had overflowed in past rain events. Although the city did
not actually make any representation regarding the size of the sewer,
the private engineering firm it hired in 1989 made representations
about the sewer's capacity and size. Plaintiff's claim, reduced to its
essence, is that, had the city built its drainage infrastructure the size
it said it would, the rain would not have flooded and damaged his
basement. Plaintiff claimed that the infrastructure, as built, can
drain less than the amount of water indicated by the private engi-
neering firm and that this is a "defect" under the provisions of MCL
691.1416 to MCL 691.1419 (the "Sewage Act"), which abrogates the
immunity of the city under the governmental tort liability act
(GTLA), MCL 691.1401 et seq. The court, Donald E. Shelton, J.,
denied the city's motion for summary disposition. The city appealed.

The Court of Appeals held:

1. The Sewage Act is inapplicable to this lawsuit. The Sewage Act
provides very limited and strictly circumscribed tort liability for
sewage-related events, not contract-based liability for natural rain-
water flooding. Because the causative "event" in issue is rain, not
sewage, and because the statute provides relief for claims that sound
in tort, not contract, plaintiff has no claim under the Sewage Act.

2. Absent action by a governmental entity that somehow
diverts the natural flow of rainwater onto private property that
would otherwise not have experienced rain-caused flooding, the

Sewage Act does not address or apply to the consequences of severe weather such as rainstorms. The Sewage Act does not cover the event complained of, because it addresses sewage, not rain.

3. Nothing in the Sewage Act imposes liability or creates a duty premised on representations of the city. The Sewage Act abrogates all common-law theories of liability, including plaintiff's contract-based claim, and is the sole means of recovery for sewage-related events, regardless of the legal theory advanced by any plaintiff. Because plaintiff's entire theory of recovery is predicated on words and representations, his entire theory of recovery sounds in contract, not tort. Contract theories of liability are expressly abrogated by the act and prohibited by its clear definitions.

4. Ann Arbor did not take any affirmative action that led to plaintiff's damages. The city's actions actually helped plaintiff by lessening the damage plaintiff otherwise would have suffered during the rainstorm. As a matter of objective reality, the relief sewer cannot conceivably be the cause of the flooding at issue. The order denying Ann Arbor's motion for summary disposition is reversed and the claim is dismissed.

Reversed.

O'CONNELL, J., concurring with both the result and the reasoning of the majority opinion, wrote separately to address the provisions of the GTLA and to note that even if plaintiff's claim is analyzed as sounding in tort, plaintiff cannot make the requisite showing that the alleged defects were a substantial proximate cause of the overflow and of the rainwater in plaintiff's basement. Although reasonable minds might differ regarding whether the relief storm sewer was defective, no reasonable mind could conclude that the relief storm sewer was a substantial proximate cause of the rainwater in the basement.

BECKERING, P.J., dissenting, stated that the GTLA provides that a governmental agency that knows, or in the exercise of reasonable diligence should know, about a defect in a sewage disposal system (whether it be a defect in the design or a malfunction) must take reasonable steps in a reasonable amount of time to repair, correct, or remedy the defect. The failure to do so exposes the governmental agency to liability for damages proximately caused by the defect. Plaintiff produced evidence to establish that the relief storm sewer system at issue contained defects in its design and construction that caused it to back up during a rainstorm and flood plaintiff's basement and that the city knew about the defects and had plenty of time to fix them. The nature of the liability sought to be imposed in this case is tort liability grounded in MCL 691.1417, not contractual liability. Plaintiff alleged shortcomings in the

design and construction of the system and the GTLA expressly
provides a cause of action for such claims. Although the city does
not have a general duty to remove naturally collecting surface
water and rainwater from private property, because it voluntarily
assumed this function, it had a duty under the GTLA to take
reasonable steps in a reasonable amount of time to repair, correct,
or remedy a known defect or a defect that it should have known of
through the exercise of reasonable diligence. The city's failure to
correct any known design or construction defects exposed it to
liability according to the GTLA. A sewage disposal system under
the GTLA is not limited to instrumentalities dealing with sewage
or waste matter. The GTLA applies to events involving rainwater.
A storm water drain system is a sewage disposal system. Plaintiff
presented evidence to either establish or create genuine issues of
material fact concerning the elements set forth in MCL
691.1417(3)(a) to (e), which, if met, would entitle plaintiff to
recovery. There is no merit to the city's unpreserved argument
that plaintiff's flooding was not the result of a sewage disposal
system event. The trial court properly determined that genuine
issues of material fact existed. The denial of the city's motion for
summary disposition should be affirmed.

*Conlin, McKenney & Philbrick, P.C.* (by *W. Daniel
Troyka*), for Lawrence Fingerle.

*Stephen K. Postema* and *Robert W. West* for the city of
Ann Arbor.

Before: BECKERING, P.J., and SAAD and O'CONNELL, JJ.

SAAD, J. Defendant city of Ann Arbor appeals the trial
court's denial of its motion for summary disposition of
plaintiff's claim under MCL 691.1416 to MCL 691.1419
(the "Sewage Act") of the governmental tort liability act
(GTLA), MCL 691.1401 *et seq.*[1] For the reasons set forth

---

[1] Our Court reviews de novo both the applicability of governmental
immunity and a trial court's decision on a motion for summary disposi-
tion under MCR 2.116(C)(7). *Roby v Mount Clemens*, 274 Mich App 26,
28; 731 NW2d 494 (2007). Motions for summary disposition under MCR
2.116(C)(7) are granted when a claim is barred by "immunity granted by
law." The moving party may "support its motion for summary disposition

in this opinion, we reverse and dismiss plaintiff's claim.

I. ANALYSIS

Plaintiff's home is located in the Landsdowne Subdivision in Ann Arbor. The neighborhood has historically been prone to flooding, and Ann Arbor, without any legal duty to do so, built drainage infrastructure to service the area in the early 1990s.[2] Yet, despite the fact that Ann Arbor's infrastructure helped to reduce the amount of rain-caused flooding—a fact that plaintiff concedes[3]—flooding continued to occur during and after large rainstorms in the 1990s and 2000s. Plaintiff claims that he was unaware of the risk of flooding. In 2002, he built a finished basement and a large egress window directly across from a private retention basin that had overflowed in past rain events. In June 2010, an intense rainstorm caused substantial flooding in the Landsdowne Subdivision, and rainwater entered plaintiff's home through the egress window that faced the retention basin. Plaintiff's claim, reduced to its essence, is this: had Ann Arbor built its drainage infrastructure of the size it said it would,[4] the rain would not

under MCR 2.116(C)(7) with 'affidavits, depositions, admissions, or other documentary evidence,' the substance of which would be admissible at trial." *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008), quoting *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). "The contents of the complaint are accepted as true unless contradicted by documentation submitted by the movant." *Maiden*, 461 Mich at 119.

[2] In 1989, the city hired an engineering firm to investigate the water buildup in the neighborhood. According to the report and affidavit of plaintiff's expert witness, engineer Clif Seiber, the firm suggested construction of a relief storm sewer that could accommodate at least 3.25 inches of rainfall, the amount of water associated with a major, "10-year storm event."

[3] In his brief, plaintiff states that *"the Relief Sewer was able to handle only about one-fifth of the rainfall* generated by the June 2010 rain event . . . ." (Emphasis added.)

[4] As noted, the city did not actually make any representation regarding the size of the sewer—the private engineering firm it hired in 1989 made the

have flooded and damaged his basement.

Plaintiff's theory of recovery is deceptively simple, yet novel and problematic. If adopted by our Court, it would impose unlimited and unprecedented liability, and create the potential for financially crippling damage awards against cities—and ultimately, their taxpaying citizens—never seen in American or Michigan law.[5]

What makes plaintiff's radical claim even stranger is that it is brought against a governmental entity that the Michigan Legislature has protected with significant governmental immunity laws.[6] To further underscore the oddity of plaintiff's action, his specific claim is raised under a narrowly defined and strictly limited statutory exception[7] to

representations about the sewer's capacity and size. Plaintiff bases his entire suit on the representation made by the private engineering firm.

[5] To our knowledge, American law has never imposed a duty or obligation on governmental entities to protect private property owners from extreme weather. See 1 Restatement Torts, 3d, Liability for Physical & Emotional Harm, § 3, comment *l*, p 37, and *Golden & Boter Transfer Co v Brown & Sehler Co*, 209 Mich 503, 510; 177 NW 202 (1920) (in an action alleging a private tort, the trial court defined an " 'act of God' " as " 'those events and accidents which proceed from natural causes and cannot be anticipated and provided against, such as unprecedented storms, or freshets, lightning, earthquakes, etc.,' " and noted that the defendants would not be liable for injuries caused by such an event).

[6] The GTLA provides blanket immunity from tort suit to governmental entities engaged in governmental functions, save for narrow, enumerated exceptions. MCL 691.1407 mandates that "[e]xcept as otherwise provided in this act, a governmental agency is immune from *tort* liability if the governmental agency is engaged in the exercise or discharge of a governmental function." MCL 691.1407(1) (emphasis added); *Maskery v Univ of Mich Bd of Regents*, 468 Mich 609, 613; 664 NW2d 165 (2003).

[7] "The judiciary's objective when interpreting a statute is to discern and give effect to the intent of the Legislature. Once the intent of the Legislature is discovered, it must prevail regardless of any rule of statutory construction to the contrary." *Menard Inc v Dep't of Treasury*, 302 Mich App 467, 471; 838 NW2d 736 (2013) (citations omitted). Legislative intent is most reliably discerned by "examining the

governmental immunity.[8] Again, the Sewage Act[9] is intended to provide comprehensive and broad immunity, and limited tort liability,[10] to governmental entities, and any exceptions are interpreted narrowly and

language of the statute itself; '[i]f the language is clear and unambiguous, no further construction is necessary or allowed to expand what the Legislature clearly intended to cover.' " *People v Breidenbach*, 489 Mich 1, 8; 798 NW2d 738 (2011) (quotation marks and citations omitted). Our Court is to "interpret th[e] words in [the statute in] light of their ordinary meaning and their context within the statute and read them harmoniously to give effect to the statute as a whole." *Johnson v Recca*, 492 Mich 169, 177; 821 NW2d 520 (2012) (citation omitted). "Statutes that relate to the same subject or share a common purpose are *in pari materia* and must be read together as one law, even if they contain no reference to one another." *Maple Grove Twp v Misteguay Creek Intercounty Drain Bd*, 298 Mich App 200, 212; 828 NW2d 459 (2012) (quotation marks and citation omitted).

[8] See *Bosanic v Motz Dev, Inc*, 277 Mich App 277, 284; 745 NW2d 513 (2007) ("Plaintiffs can seek damages under the [Sewage Act] if they have stated valid claims with regard to its elements . . ."). Further, "[i]n construing [the Sewage Act], the one basic principle that must guide [the court's] decision is that the immunity conferred upon governmental agencies is *broad*, and the statutory exceptions thereto are to be *narrowly* construed." *Id*. at 282 (quotation marks and citations omitted).

[9] The Sewage Act governs liability for torts that arise from " '[s]ewage disposal system event[s],' " which are defined as: "the overflow or backup of a sewage disposal system onto real property." MCL 691.1416(k). The Legislature enacted these provisions in 2001 to abrogate the common-law trespass-nuisance doctrine, which the Legislature felt that the judiciary applied too freely. House Legislative Analysis, SB 109, December 11, 2001. The Sewage Act thus created a "more limited legal liability standard" that would make it more difficult for plaintiffs to prevail against governmental defendants in suits that involved sewage backups. *Id*., at 1. The aim of the statute is "[t]o afford property owners, individuals, and governmental agencies greater efficiency, certainty, and consistency in the provision of relief for damages or physical injuries caused by a sewage disposal system event . . . ." MCL 691.1417(1).

[10] MCL 691.1417 abrogates "common law exceptions, if any, to immunity for the overflow or backup of a sewage disposal system and provide[s] the *sole remedy* for obtaining any form of relief for damages . . . caused by a sewage disposal system event regardless of the legal theory." MCL 691.1417(2) (emphasis added).

strictly.[11] Plaintiff's attempt to shoehorn his cause of action into this statutory framework would radically expand governmental liability in a statute expressly designed to do just the opposite.

In other words, plaintiff has brought suit for recovery under a statute that is simply inapplicable to his lawsuit. The reason is clear. The Sewage Act provides very limited and strictly circumscribed *tort* liability for *sewage*-related events, not *contract*-based liability for *natural rainwater* flooding.[12] Stated differently, because the causative "event" in issue is rain, not sewage, and because the statute provides relief for claims that sound in tort, not contract, plaintiff has no claim under the Sewage Act.

That is, absent action by a governmental entity that somehow diverts the natural flow of rainwater onto

---

In place of the common law, the Sewage Act makes "governmental agencies" liable for "the overflow or backup of a sewage disposal system" if the "overflow or backup is a sewage disposal system event" and the "governmental agency is an appropriate governmental agency." MCL 691.1417(2). The statute is careful to limit governmental liability through specific definitions of these terms, found in MCL 691.1416. And it creates no liability for mere statements or representations made by governmental entities or their agents. See MCL 691.1417(2).

[11] See note 8 of this opinion.

[12] Again, by its own terms, the GTLA is a tort statute. MCL 691.1407(1). Because all GTLA actions sound in tort, if a GTLA defendant asserts that he owed the plaintiff no duty or did not cause his injury, the plaintiff must demonstrate that the defendant owed the plaintiff a duty and caused his injury. MCL 691.1412. The Sewage Act was explicitly designed to limit governmental liability for "sewage disposal system events." House Legislative Analysis, SB 109, December 11, 2001, p 3. It abrogates all common-law theories for sewage-related claims, and provides the "sole remedy" for such actions. MCL 691.1417(2). A plaintiff therefore cannot use a common-law action to sue a governmental entity under the Sewage Act. The Sewage Act does not create liability for mere statements or representations made by governmental agencies or their agents. See *id.*

private property[13] that would otherwise not have expe-
rienced rain-caused flooding, the Sewage Act literally
does not address or apply to the consequences of severe
weather such as rainstorms.[14] Again, the reason is
obvious. No law has ever imposed an obligation (and
thus, liability) upon a governmental entity to protect
private property owners from acts of God or conse-

---

[13] See *Linton v Arenac Co Rd Comm*, 273 Mich App 107, 121; 729 NW2d
883 (2006) (holding that the plaintiffs made a valid claim under MCL
691.1417 when the defendant road commission dumped tree branches
into a public storm drainage ditch, obstructing water flow and forcing
water onto the plaintiffs' property). We do not interpret *Linton* to say, as
plaintiff's theory requires, that a governmental entity has an affirmative
obligation and duty to protect citizens from the natural flow of rainwater.
Instead, it holds that governmental entities that take affirmative action
that causes flooding—i.e., dumping tree branches into a drainage ditch,
which caused a water backup, which caused flooding, which caused
damages—are liable under the Sewage Act. *Linton*, 273 Mich App at 121.
For a pre-Sewage Act application of this "affirmative action" principle,
see, for example, *Donaldson v City of Marshall*, 247 Mich 357, 359; 225
NW 529 (1929) ("The city of Marshall was under no obligation to drain
the plaintiff's land, but when it established a drain in that vicinity it
became its duty to maintain it in such a way as to carry off the natural
flow of the water, and if by reason of its failure to do so water
accumulated on plaintiff's land *which otherwise would not have been
there*, the city would be liable for any damages sustained") (emphasis
added).

[14] It is doubtful from the plain language of MCL 691.1416(j) that the
Sewage Act applies to events involving rainwater at all. The listed
types of sewers (including storm sewers) are all modified by the
predicate "used or useful in connection with the collection, treatment,
and disposal of sewage and industrial wastes . . . ." As such, the
Sewage Act does not seem to apply to any events that exclusively
involve rainwater, as here, which have nothing to do "with the
collection, treatment, and disposal of sewage and industrial
wastes . . . ." See *Fisher Sand & Gravel Co v Neal A Sweebe, Inc*, 494
Mich 543, 560; 837 NW2d 244 (2013) ("[W]hen the language of the
statute is unambiguous, it must be enforced as written.").

However, notwithstanding the statute's apparent total inapplicability to
rainwater, we need not address this issue because plaintiff's claim fails
for other reasons.

quences of severe weather.[15] Historically, this has been an issue for private property owners and their insurers, not an area of liability for cities and their taxpaying residents.[16] And there is nothing in this statute that remotely suggests that the Michigan Legislature made such a dramatic shift in public policy. We should think that if such a seismic change was intended, Michigan's Legislature would have made this very clear.[17] The Sewage Act strongly suggests the opposite result. Again, its expressed intent is to strictly limit liability for sewage-related events caused by governmental entities.[18]

---

[15] See note 5 of this opinion.

[16] Governmental entities have no duty to construct drainage infrastructure to catch surface rainwater. See MCL 101.1 ("The council of any city *may* establish, construct and maintain sewers and drains . . .") (emphasis added); *Ashley v Port Huron*, 35 Mich 296, 299 (1877) (COOLEY, C.J.) ("[F]looding might result from a failure to construct any sewer whatever; but clearly no action could be sustained for a mere neglect to exercise a discretionary authority."); *Kuriakuz v West Bloomfield Twp*, 196 Mich App 175, 177; 492 NW2d 757 (1992) (holding against the plaintiffs for failing to show "that the township had an affirmative duty to construct a storm drainage system"); *McSwain v Redford Twp*, 173 Mich App 492, 500; 434 NW2d 171 (1988) ("Where . . . the governmental unit has no affirmative duty, by statute or otherwise . . . , to construct a sanitary sewer, we do not believe it can be held liable for damage which might not have occurred had the sewer been constructed.").

[17] "The Legislature is presumed to know the common law, and any abrogation of the common law must be explicit." *Hamed v Wayne Co*, 490 Mich 1, 22 n 57; 803 NW2d 237 (2011). As noted, governmental entities have never been held liable for failing to drain naturally occurring rainwater flooding from private property. Accordingly, if the Legislature wanted to expand governmental liability to encompass sewage- and rain-caused flooding, it would have enacted a statute that explicitly expressed such aims.

[18] To repeat: the Legislature enacted the Sewage Act with the explicit intent of further limiting the already narrow governmental liability for sewage- or rain-caused flooding. This intent is explicitly expressed in the statute's language, which states that the Sewage Act is the "sole remedy" for sewage- or rain-caused flooding, and abrogates all common-law claims related to such flooding. MCL 691.1417(2). The statute's plain language thus mandates immediate rejection of plaintiff's claim.

In brief, the city is not obliged by the Sewage Act to deal in any way with the consequences of rain that naturally flows from a higher to a lower elevation. In brief, the statute does not cover the event complained of, because it addresses sewage, not rain.

Because the Sewage Act does not create or impose the radical and dangerous theory advanced by plaintiff, and because plaintiff has no common-law cause of action against Ann Arbor, plaintiff cleverly couches his theory of recovery under a deceptively appealing contractual theory—"had the city built what it said it would,[19] my basement would not have flooded." But this is a tort statute, not a statute that addresses contract-based liability.[20] Nothing in the plain language of the statute imposes liability or creates a duty premised on representations of the city.[21]

Close examination of every paragraph, every sentence, and every word of the Sewage Act reveals nothing to support the idea that a city should be held liable for what it said or represented. To the contrary, the statute says expressly that it: (1) abrogates all common-law theories of liability (this would include plaintiff's

---

[19] Again, plaintiff really means: had the city built drainage infrastructure that the private engineering firm said would be built. Were we nonetheless to allow plaintiff to plead his contract claim, it is unlikely he would prevail—the private engineering firm is at best an agent of the city, and principals are not always liable for the acts of their agents. See *Detroit v Corey*, 9 Mich 165, 184 (1861) ("When the relation of principal and agent, or master and servant exists, the rule of *respondeat superior* is applicable, but not when the relation is that of contractor only").

[20] See note 12 of this opinion.

[21] There is simply nothing in the Sewage Act about words, statements, or representations, much less anything that binds the governmental entity to act in a certain way based on mere words, statements, or representations.

contract-based claim)[22] and (2) is the sole means of recovery for *sewage*-related events, regardless of the legal theory advanced by any plaintiff.[23] And because plaintiff's entire theory of recovery is predicated on words and representations, his entire theory of recovery sounds in contract, not tort[24]—and contract theories of liability are expressly abrogated by the statute and prohibited by its clear definitions.[25]

This can be clearly demonstrated by simply removing the statement or representation on which plaintiff relies—"the city said it would build drainage infrastructure of a certain size." First, had the city built its infrastructure without saying a word, it would have no liability because it had no duty by law to do anything. Moreover, by plaintiff's own admission, Ann Arbor not only did not cause the flooding, or make it worse, but instead, reduced the amount of flooding.[26] Under these

---

[22] Again, MCL 691.1417(2) abrogates "common law exceptions, if any, to immunity for the overflow or backup of a sewage disposal system and provide[s] the *sole remedy* for obtaining any form of relief for damages . . . caused by a sewage disposal system event regardless of the legal theory." (Emphasis added.) MCL 691.1417(2) (emphasis added). See also note 8 of this opinion.

[23] MCL 691.1417(2). See also note 9 of this opinion.

[24] "[A] tort requires a 'wrong independent of a contract' . . . and 'the distinguishing feature of a tort [is] that it consists in the violation of a right given or neglect of a duty imposed by law, and not by contract'." *In re Bradley Estate*, 494 Mich 367, 383; 835 NW2d 545 (2013) (citation omitted) (second alteration in original). Said another way, "[a]s contract law rests upon obligations imposed by bargain, tort law rests upon obligations imposed by law." *Goossen v Estate of Standaert*, 189 Wis 2d 237, 250; 525 NW2d 314 (Wis App, 1994). Cases from foreign jurisdictions are not binding, but can be persuasive. *People v Campbell*, 289 Mich App 533, 535; 798 NW2d 514 (2010).

[25] As common-law claims, contract suits are therefore expressly abrogated by and cannot be brought under the Sewage Act. MCL 691.1417(2).

[26] Again, plaintiff states in his brief: *"the Relief Sewer was able to handle only about one-fifth of the rainfall* generated by the June 2010 rain event . . . ." (Emphasis added.)

facts, there has never been a court decision in Michigan holding that the government breached a duty to an owner of private property.

Thus, the only duty alleged in plaintiff's telling arises because the city said it would build drainage infrastructure of a certain size.[27] In other words, the city's duty, under plaintiff's theory, is to do what it said it would do. But this is a contract theory, not tort, and not to be found in the Sewage Act. And what of the breach or defect? There is none. Unless it is premised on words, because the city did not build drainage infrastructure of the size it said it would—the defect is created by the words, the defect is the representation. Of course, as mentioned, the city's infrastructure reduced the amount of rainwater that otherwise would have been involved in the flooding. And what of causation? Clearly, the severe rainstorm and plaintiff's inexplicable building of a basement and an egress window in a flood plain across from a private retention basin that had overflowed in the past, would appear to be the cause in fact and proximate cause of plaintiff's damage.[28] Yet again, in plaintiff's telling, the cause is premised on the representation—"had the city only built to the size it said it would, my basement would not have experienced rain damage."

What emerges from plaintiff's hybrid theory of recovery is a cause of action premised solely on words—a cause of action that sounds in contract, not tort. Remove the words, there is no duty. Remove the words,

---

[27] Again, see note 4 of this opinion.

[28] The Sewage Act requires that the "defect" in the sewer be the "substantial proximate cause" of the plaintiff's injury. MCL 691.1417(3)(e). "Substantial proximate cause" is defined to mean: "a proximate cause that was 50% or more of the cause of the event and the property damage or physical injury." MCL 691.1416(*l*).

there is no defect. Remove the words, there is no causation. We again emphasize that nothing in the Sewage Act even remotely suggests liability premised on representations, and for good reason. Contract law, with its own peculiar principles and order and allocation of proofs, has no place in a tort statute, much less a self-defined tort statute that advances a public policy of broad governmental immunity, with strictly limited exceptions. Moreover, a cause of action that sounds in contract, such as plaintiff's, is in reality a common-law theory of recovery that is expressly abrogated by the Sewage Act. And, again, for good reason.

First, if we examine plaintiff's claim, he says he knew nothing about the historic flooding in his own neighborhood and presumably, therefore, is unable to claim that he relied on the representation of the city when he built his basement and egress window. Indeed, perhaps this anomaly is what led plaintiff to attempt to shoehorn his contract, representation-based theory of recovery under the Sewage Act. Second and more importantly, were we to accept a contract-based theory of recovery, this would create an endless and unpredictable stream of questions and problems. For example, would a plaintiff have to prove reliance on the representations in order to state a cause of action for detrimental reliance or promissory estoppel?[29] This theory or cause of action cannot be found anywhere in the Sewage Act. Further, if one administration were to

---

[29] Here, plaintiff makes no allegation that he relied on anything the city (or the private engineering firm) said or did, which means that even his contractual claim would fail—he cannot show that the city "promised" him anything, or that he relied on anything the city "promised" him. "[T]he sine qua non of the theory of promissory estoppel is that the promise be clear and definite . . . ." *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004) (quotation marks and citations omitted).

make a statement of intent, would this bind a successor administration? The answer is certainly not in the Sewage Act. If the project is later judged to be too extravagant or expensive, or the city experiences financial crisis, can the project be modified, downsized, or abandoned, and when and by whom, and who could sue under such circumstances? Troubling questions with no answers in the Sewage Act, for obvious reasons.[30] This is a tort statute, not a statute that creates contractual-type liability.

## II. RESPONSE TO THE DISSENT

We respectfully disagree with the dissent's view of this case. As an introduction, let's make clear what this case does not involve. It does not involve a governmental entity that caused a flood. Plaintiff makes no allegation that Ann Arbor, by its direct action, diverted naturally flowing water or rainwater onto property that otherwise would not have been flooded. Nor did it fail to remove an obstruction in its drainage system that then led to a flood. And this case does not involve a sewage backup.

---

[30] If we were to adopt plaintiff's radical theory that the Sewage Act creates liability for mere statements made by governmental entities, the next step for enterprising plaintiffs would be to hold local governments liable for any statement they have made related to drainage infrastructure. Illinois is already sliding down this slippery slope, where Farmer's Insurance recently used an Illinois statute similar to the Sewage Act to demand compensation from local governments that had merely acknowledged potential flooding risks from climate change, but then had not expanded their drainage infrastructure to cope with the supposedly increased risk of flooding. If adopted, such a cause of action would result in massive liability for local governments—effectively crippling their ability to provide basic services to their residents. See Mica Rosenberg, Reuters, *U.S. insurer class action may signal wave of climate-change suits* <http://www.reuters.com/article/2014/05/16/usa-environment-insurance-idUSL1N0O11T620140516?feedType=RSS&feedName=everything&virtualBrandChannel=11563> (posted May 16, 2014) (accessed November 3, 2014) [http://perma.cc/9S6L-34EF].

Again, this case involves a heavy rainstorm that caused a flood in a low-lying area of Ann Arbor that had historically experienced rain-caused floods. By plaintiff's own admission, Ann Arbor, without any legal obligation to do so, built drainage infrastructure that helped *reduce* the amount of rainwater on his property. Nonetheless, plaintiff has brought suit against Ann Arbor because a large storm caused a flood of rainwater that broke through his basement window and caused him damages. To substantiate his action, plaintiff points to a 1990 statement made by the private engineering firm that designed the drainage infrastructure near his property, which indicated that the infrastructure could drain a specific amount of water. However, the drainage infrastructure, as built, can drain less than this specific amount of water. Plaintiff claims and the dissent insists this is a "defect" under MCL 691.1416(e), which abrogates governmental immunity, and that Ann Arbor should pay him money for the damages his property suffered during the flood.

There is a fatal flaw to this claim, of which the dissent is aware. As it admits, neither the Sewage Act, the wider GTLA, nor any common law has *ever* imposed a duty upon governmental entities to prevent damage to private property caused by extreme weather, such as flooding caused by a rainstorm. This state of affairs raises a serious problem and question for plaintiff and the dissent: If a city has no duty to provide drainage infrastructure to remove rainwater from private property, how can it have a duty to remove more rainwater than it said it would from plaintiff's property? In other words, if the city has no duty to capture *any* rain, how can it have a duty to capture *more* rain?

Simple, according to the dissent. Because Ann Arbor's relief sewer is "undersized"—i.e., it isn't as big as

.

the private engineering firm that designed it said it would be—it is "defective" by design under MCL 691.1416(e). The supposed "defects" cataloged by the dissent are merely restatements of the above sentence in new terms.

But the dissent's answer to our original question—"if the city has no duty to capture any rain, then how can it have a duty to capture more rain?"—isn't really an answer at all. Because its answer—"a relief sewer with an inadequate capacity is a defective relief sewer"— invites yet another question, which circles back to the first: on what does plaintiff base his assertion that the relief sewer is of "inadequate" capacity and thus "defective" under MCL 691.1416(e)? The answer, of course, is: plaintiff's entire suit, and the dissent's analysis, hinges on a single statement made by the private engineering firm about the capacity of the relief sewer.

To see how, let's deconstruct the dissent's argument. The dissent notes that the private engineering firm professed an intention to design a relief sewer that could collect 3.25 inches of rainfall. This statement provides the dissent with its point of entry to MCL 691.1417: because the relief sewer, as built, did not actually collect 3.25 inches of rainfall, it is "defective" under MCL 691.1416(e), and thus creates liability for Ann Arbor under MCL 691.1417(3)(b). The statement is also the root of Ann Arbor's supposed breach of duty, because Ann Arbor knew the relief sewer had not solved all the flooding problems in plaintiff's neighborhood. And it is the so-called "substantial proximate cause" of plaintiff's damages, because if the sewer had been able to accommodate 3.25 inches of rainfall, as the private engineering firm said it would be able to, plaintiff's basement would not have been flooded during the rainstorm.

Plaintiff's and the dissent's reliance on the private engineering firm's statement is their undoing. The less flattering corollary of "the dissent's entire analysis hinges on a single statement" is "without that single statement, the dissent's analysis is wrong." Indeed, under plaintiff's theory, it is—if the private engineering firm had said nothing regarding the intended capacity of the relief sewer, plaintiff would unquestionably have no cause of action under MCL 691.1417. The sewer would not be "defective" under MCL 691.1416(e), because governmental agencies have no duty to build drainage infrastructure, nor does MCL 691.1417 create any such duty. The fact that Ann Arbor did build infrastructure would be inconsequential, because plaintiff would have no frame of reference by which to claim that the relief sewer was "defective," or that the relief sewer's capacity "caused" him damages under MCL 691.1417(3)(e). Duty, breach, causation—the dissent provides no independent justification for any of these essential tort concepts and relates each back to the private engineering firm's statement.

The testimony of plaintiff's expert witness, engineer Clif Seiber, only serves to further illustrate this fatal flaw. Seiber's report is replete with references to what the private engineering firm stated it would build—how much water the relief sewer was supposed to accept, how much rainfall the sewer was intended to handle. Plaintiff's own statements at the April 2012 hearing on the motion for summary disposition and his appellate brief echo this analysis, stressing that the sewer was undersized based on the statement of the private engineering firm.

The singular importance of the private engineering firm's statement to plaintiff's claim, then, is relevant for two reasons. First, it reveals that plaintiff's claim

does not sound in tort. Insofar as it sounds anywhere, it sounds in contract. Again: "a tort requires a 'wrong independent of a contract' and ... 'the distinguishing feature of a tort [is] that it consists in the violation of a right given or neglect of a duty imposed by law, and not by contract.' " *In re Bradley Estate*, 494 Mich 367, 383; 835 NW2d 545 (2013) (citation omitted). Plaintiff does not allege that Ann Arbor owes him any legal duty independent of the statement the private engineering firm made about the relief sewer's capacity.

Second, were plaintiff to do so—were he to claim that the private engineering firm's 1990 statement about the capacity of the relief sewer *created a duty* for Ann Arbor to build drainage infrastructure of exactly that capacity—his claim would contravene centuries of common law and statutory law, and radically expand the scope of municipal liability.[31] To repeat: governmental entities do not have a duty to build drainage infrastructure. Accordingly, they have never been liable under the Sewage Act or the common law for acts of God, such as rain-caused floods. The Sewage Act does not mandate that governmental entities prevent all harm caused by natural rainwater flooding of private property. Rather, it mandates that governmental entities *do no harm*, by making them liable for drainage backups that are "substantial[ly] proximate[ly] cause[d]"[32] by their affirmative actions.[33] The dissent does not recognize this distinction, which is crucially important when interpreting a statute that is explicitly intended to *limit*—not expand—governmental liability.[34]

---

[31] See note 5 of this opinion.

[32] MCL 691.1417(3)(e).

[33] See note 13 of this opinion.

[34] *Bosanic*, 277 Mich App at 282 ("In construing [the Sewage Act], the one basic principle that must guide [the court's] decision is that the

The dissent also does not apply these legal principles to the factual background of this case. Again, the Sewage Act does not mandate that governmental entities prevent all harm—rather, it mandates that governmental entities do no harm. Here, Ann Arbor did not take any affirmative action that led to plaintiff's damages. In fact, its actions, which, again, it was not required to take, actually *helped* plaintiff by lessening the damage plaintiff otherwise would have suffered during the June 5-6, 2010 rainstorm.

The dissent devotes considerable energy to rehashing plaintiff's "evidence" of how the "defective"—i.e., undersized—nature of the relief sewer "caused" his injuries. But "undersized" means nothing legally if the city has no duty to collect any rain—or in plaintiff's telling, more rain—than the relief sewer actually did. The "evidence" of the relief sewer's "undersized" nature includes the (hardly scientific) statement of plaintiff's neighbor that the relief sewer "never made things better," in that it supposedly did not "solve" the problem of the rain-caused flooding in plaintiff's neighborhood. This statement is illogical. Whatever its alleged shortcomings (if any), the relief sewer had some capacity to remove water from the surface—it is an unobstructed hole in the ground, and unobstructed holes collect rain and surface water.[35] Again, plaintiff admits as much in his brief when he states, "Due to design defects, the Relief Sewer *was able to handle only about one-fifth of the*

immunity conferred upon governmental agencies is *broad*, and the statutory exceptions thereto are to be *narrowly* construed") (quotation marks and citations omitted).

[35] Plaintiff's expert witness stated in his report that the relief sewer was unobstructed and that "system obstructions were not the cause of the June, 2010 flooding."

*rainfall generated by the June 2010 rain event . . . ."*
(Emphasis added.)[36]

The dissent's analysis misses this crucial point. To repeat: nothing Ann Arbor did made the flooding worse. Nothing Ann Arbor did diverted more water into plaintiff's basement. Again, Ann Arbor's actions actually *reduced* the amount of rainwater that would have been involved in the flood absent the relief sewer. Therefore, as a matter of objective reality, the relief sewer cannot conceivably be the cause of the flooding at issue.

Nor does the dissent address the obvious outcomes of adopting plaintiff's theory of liability as binding precedent. Ideas have consequences, and the dissent's refusal to grapple with the consequences of its ideas are indicative of the weakness of its ideas.

As noted, the adoption of plaintiff's legal theory will cause municipalities to face unprecedented liability for mere statements of intent related to drainage infrastructure. Under the dissent's interpretation of the Sewage Act, if a governmental entity says it is going to build drainage infrastructure of a specific capacity, and the infrastructure, as built, does not drain that exact amount of water, the drain will be "defective" and the governmental entity will be liable for damages.

Municipalities will move to eliminate such liability in two ways. First, they will refuse to be transparent about new storm-sewer infrastructure, and will not inform residents about the intended capacity or design specifications of the new projects. Or, worse, municipalities may simply refuse to build new drainage infrastructure altogether. If a municipality has no

---

[36] Ann Arbor's expert witness, Mark Pribak, noted the same, observing that the sewer "will accept a certain flow and provides a certain amount of relief to whatever that upstream flow is."

duty to help its citizens (read: future plaintiffs) with rain-caused floods, and will face potentially crippling liability if it seeks to alleviate the flooding (meaning its taxpayers would pay for suits and damage awards), why offer any assistance at all? Under such a legal regime, Michiganders would face more floods, more water damage, and more safety risks. This was certainly not the intent of the Legislature when it enacted the Sewage Act and we refuse to construe the statute in a way that will create that outcome.

### III. CONCLUSION

For the reasons stated above, the Sewage Act simply provides no relief to plaintiff. Accordingly, his claim is hereby dismissed.

Reversed.

O'CONNELL, J., concurred with SAAD, J.

O'CONNELL, J. (*concurring*). I concur with both the result and the reasoning of Judge SAAD's well written majority opinion. I write separately to address the provisions of the governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, as it is applicable to the facts of this case.[1] This case presents a governmental immunity issue, which is a question of law under MCR 2.116(C)(7). Because the material facts are undisputed, and because reasonable minds could not differ regarding the legal effect of those facts, the trial court's decision must be reversed.

---

[1] I agree with Judge SAAD that plaintiff's complaint sounds in contract, but the trial court, plaintiff, and the dissent analyze the complaint as if it were a tort claim. I note that even if plaintiff's claim is analyzed as sounding in tort, the alleged tort claim fails for the reasons stated in this opinion.

I. GOVERNMENTAL IMMUNITY FOR SEWAGE
DISPOSAL SYSTEM EVENTS

As both the majority and the dissenting opinions correctly recognize, the city is immune from liability for plaintiff's claims unless plaintiff can establish an exception to immunity under the applicable provisions of the GTLA, see MCL 691.1417. Accordingly, to avoid summary disposition, plaintiff was required to show as a matter of law that during the June 2010 downpour:

(a) The [city] was an appropriate governmental agency [to be sued].

(b) The sewage disposal system had a defect.

(c) The [city] knew, or in the exercise of reasonable diligence should have known, about the defect.

(d) The [city], having the legal authority to do so, failed to take reasonable steps in a reasonable amount of time to repair, correct, or remedy the defect.

(e) The defect was a substantial proximate cause of the event and the property damage or physical injury. [MCL 691.1417(3); accord *Willett v Waterford Charter Twp*, 271 Mich App 38, 49-50; 718 NW2d 386 (2006).]

The exception to governmental immunity applies only if plaintiff can show that at the time of the deluge, *all* of these factors existed. *Willett*, 271 Mich App at 50, 52.

II. NO SUBSTANTIAL PROXIMATE CAUSE

In this case, plaintiff cannot make the requisite showing of substantial proximate cause.[2] To establish substantial proximate cause under the GTLA, plaintiff must show that the alleged defect was "a substantial proximate cause of the event *and* the property damage . . . ."

---

[2] As fully explained in the majority opinion, plaintiff's claim fails for several other reasons.

MCL 691.1417(3)(e) (emphasis added). The GTLA defines "substantial proximate cause" as "a proximate cause that was 50% or more of the cause of the event *and* the property damage . . . ." MCL 691.1416(*l*) (emphasis added). In turn, the GTLA defines an "event" as "the overflow or backup of a sewage disposal system onto real property." MCL 691.1416(k). According to these definitions, plaintiff was required to show that during the rainstorm on June 5-6, 2010, the alleged defects were 50% or more of the cause of the rainwater overflow, *and* the alleged defects were 50% or more of the cause of rainwater entering plaintiff's basement.

The undisputed facts in this case establish that there were multiple causes of the rainwater in plaintiff's basement on June 5-6, 2010. Those causes included the unusually intense rainstorm, the allegedly defective relief storm sewer, and the installation of plaintiff's basement egress window. The record confirms that both before and after the 1990 construction of the relief storm sewer, rainwater periodically flooded into basements in plaintiff's neighborhood. Plaintiff has provided no evidence to establish that the relief storm sewer exacerbated the flooding, or, for that matter, that the relief storm sewer failed to divert water. Instead, plaintiff contends that although the city had no duty to build any relief storm sewer, the city should nonetheless have built a bigger, better system than the one actually built. However, plaintiff provides no evidence to establish that bigger would be better in this case. Plaintiff's evidence establishes, at best, that on the night of the intense rainstorm, the relief storm sewer did not divert enough rainwater to prevent water from entering plaintiff's basement egress window. This evidence does not establish that the alleged defects were a substantial proximate cause of the overflow and of the rainwater in plaintiff's basement.

The trial court and the dissent conclude that there is a factual issue regarding whether the alleged defects were a substantial proximate cause of the overflow and the influx of rainwater. This conclusion is incorrect, for two reasons. First, the factual issues in the record, if any, are not material to substantial proximate cause. Plaintiff contends, and the trial court and the dissent accept, that the affidavit and report of plaintiff's expert create a factual issue on the substantial proximate cause of the overflow and the damage. This contention is misplaced, because plaintiff's expert does not address the multiple causes of the overflow and of the basement rainwater. Nothing in plaintiff's expert's report assesses the effect of the relief storm sewer on the degree of basement flooding that had historically occurred or that would have occurred without the relief storm sewer. Nor does plaintiff's expert assess the effect of plaintiff's decision to add a basement egress window in an area prone to flooding. Instead, plaintiff's expert addressed solely the alleged defects in the relief storm sewer. Given the multiple causes of plaintiff's basement rainwater, the expert's report does not establish that the alleged defects were 50% or more of the cause of the overflow, or of the basement rainwater.

Second, the trial court and the dissent assume that reasonable minds would overlook the multiple causes of plaintiff's basement rainwater. I disagree with this assumption. This Court must address the causation issue as a matter of law, unless reasonable minds could differ on the legal effect of the facts. See *Willett*, 271 Mich App at 45, 53-54. The facts in this case establish that plaintiff's basement flooded because an egress window failed to withstand historic flooding from an unusually heavy rainfall. Although reasonable minds might differ regarding whether the relief storm sewer was defective, no reasonable mind could conclude that

the relief storm sewer was a substantial proximate cause of the basement rainwater.

### III. CONCLUSION

Rain happens. To my knowledge, the only faultless rain management system in history was constructed according to design specifications given in cubits, not in cubic feet.[3] The GTLA does not hold city governments to that historic standard of omniscience. In my view, to allow plaintiff's claim to go forward would be to open literal and figurative floodgates for litigation; our courts would be swamped in a torrent of sewage. Therefore, I concur in the majority decision to reverse the order of the trial court and to remand for entry of summary disposition in favor of the city.

BECKERING, P.J. (*dissenting*). With all due respect, I disagree with the analysis of my colleagues. The governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, provides a statutory framework that establishes when a governmental agency is liable for defects in its sewage disposal system. According to the express language of the GTLA, a governmental agency that knows, or in the exercise of reasonable diligence should know, about a defect in its sewage disposal system—whether it be a defect in the design or a malfunction—must take reasonable steps in a reasonable amount of time to repair, correct, or remedy the defect. Failure to do so exposes the governmental agency to liability for damages proximately caused by the defect. In this case, plaintiff, Lawrence Fingerle, produced evidence to establish that the relief storm sewer system at issue contained defects in its design and construction, which

---

[3] See Genesis 6:15.

defendant city of Ann Arbor[1] knew about and had
plenty of time to fix, that caused it to back up during a
rainstorm and flood his home. I agree with the trial
court's finding that genuine issues of material fact
exist, entitling plaintiff to a jury trial on the issues of
defects and causation. Therefore, I would affirm the
trial court's denial of defendant's motion for summary
disposition under MCL 2.116(C)(7).

### I. STANDARD OF REVIEW

This Court reviews de novo both the applicability of
governmental immunity and a trial court's decision on
a motion for summary disposition under MCR
2.116(C)(7). *Roby v Mount Clemens*, 274 Mich App 26,
28; 731 NW2d 494 (2007). "When reviewing a motion
under MCR 2.116(C)(7), a reviewing court must con-
sider all affidavits, pleadings, and other documentary
evidence submitted by the parties and construe the
pleadings and evidence in favor of the nonmoving
party." *Anzaldua v Neogen Corp*, 292 Mich App 626,
629; 808 NW2d 804 (2011). See also *Dextrom v Wexford
Co*, 287 Mich App 406, 428-429; 789 NW2d 211 (2010).
"To overcome a motion brought under MCR
2.116(C)(7), the plaintiff must allege facts warranting
the application of an exception to governmental immu-
nity." *Roby*, 274 Mich App at 28-29. "If no facts are in
dispute, or if reasonable minds could not differ regard-
ing the legal effect of the facts, the question whether the
claim is barred by governmental immunity is an issue of
law." *Pierce v City of Lansing*, 265 Mich App 174, 177;
694 NW2d 65 (2005).

---

[1] Although there are two defendants, the city of Ann Arbor and
American Fire and Casualty Company, the use of the word "defendant" in
this opinion refers solely to the city of Ann Arbor.

II. ANALYSIS

Defendant argues that it was entitled to summary disposition under MCR 2.116(C)(7) because plaintiff failed to satisfy all of the elements of MCL 691.1416 through MCL 691.1419 in order to establish an exception to governmental immunity and that plaintiff failed to establish that defendant breached a duty under the circumstances presented in this case. I disagree.

### A. APPLICABILITY OF THE GTLA TO THIS CASE AND EXISTENCE OF A STATUTORY DUTY

Absent the applicability of a statutory exception, the GTLA provides a broad grant of immunity from tort liability to governmental agencies that are engaged in the discharge or exercise of a governmental function. MCL 691.1407(1); *Maskery v Univ of Mich Bd of Regents*, 468 Mich 609, 613; 664 NW2d 165 (2003). "MCL 691.1417(2) provides an exception to governmental immunity for sewage disposal system events . . . ." *Linton v Arenac Co Rd Comm*, 273 Mich App 107, 114; 729 NW2d 883 (2006). The statute provides as follows, in pertinent part:

> A governmental agency is immune from tort liability for the overflow or backup of a sewage disposal system unless the overflow or backup is a sewage disposal system event and the governmental agency is an appropriate governmental agency. Sections 16 to 19 abrogate common law exceptions, if any, to immunity for the overflow or backup of a sewage disposal system and provide the sole remedy for obtaining any form of relief for damages or physical injuries caused by a sewage disposal system event regardless of the legal theory. [MCL 691.1417(2).]

Moreover, MCL 691.1417(3) states the following:

> If a claimant, including a claimant seeking noneconomic damages, believes that an event caused property damage or

physical injury, the claimant may seek compensation for the property damage or physical injury from a governmental agency if the claimant shows that all of the following existed at the time of the event:

(a) The governmental agency was an appropriate governmental agency.

(b) The sewage disposal system had a defect.

(c) The governmental agency knew, or in the exercise of reasonable diligence should have known, about the defect.

(d) The governmental agency, having the legal authority to do so, failed to take reasonable steps in a reasonable amount of time to repair, correct, or remedy the defect.

(e) The defect was a substantial proximate cause of the event and the property damage or physical injury.

"To successfully bring an action, a plaintiff cannot merely satisfy subsection 2 but must, instead, establish all the requirements of subsection 3." *Bosanic v Motz Dev, Inc*, 277 Mich App 277, 282; 745 NW2d 513 (2007), citing *Willett v Waterford Charter Twp*, 271 Mich App 38, 49-50; 718 NW2d 386 (2006). Moreover, the statute provides not only an exception to immunity if its requirements are satisfied, but also a cause of action. *Bosanic*, 277 Mich App at 282-284. *Bosanic* rejects the idea that the statute itself does not provide a cause of action:

The drain commissioner relies on an extremely strained reading of MCL 691.1417 to contend that the statute does not itself provide plaintiffs any cause of action but, instead, some independent cause of action must be pleaded . . . . While the argument is difficult to comprehend or summarize, the contention is that the statute provides an exception to immunity if its requirements are satisfied, but only if there is some other legal theory upon which a claim for damages is based. In other words, defendant argues that the statute does not itself provide a cause of action.

A plain reading of subsection 2 itself does not support
that conclusion and, when subsection 3 is also considered,
that conclusion becomes even less tenable. [*Id.* at 282-283.]

Thus, if plaintiff can establish the elements set forth in
MCL 691.1417, he can recover for his losses.

The majority views plaintiff's action as being
predicated on the idea that defendant did not build a
storm water drainage system that would divert as
much water as defendant said it would, amounting to
an alleged breach of promise; thus, the majority
concludes that plaintiff's claim sounds in contract
law, not tort law. As such, the majority concludes that
the GTLA is completely inapplicable under the cir-
cumstances. I do not agree with this characterization
of plaintiff's case. Plaintiff has alleged, consistent
with the plain language of the GTLA, defects in
defendant's storm sewer system of which defendant
was aware or should have been aware, and which,
according to plaintiff, proximately caused damage to
his home. For instance, plaintiff alleged that the
storm sewer at issue suffered from a host of defects,
including: (1) inadequate design capacity for regu-
larly recurring peak flows leading to recurring collec-
tion of storm water outside the detention easement,
(2) inadequate inlet capacity resulting in storm water
backup and surface pooling, (3) drainage into the
storm sewer from areas outside of the planned drain-
age area (including runoff from upstream develop-
ment), (4) failure to increase capacity in response to
increased load from upstream development, (5) inad-
equate or defective upstream detention, (6) misalign-
ment in pipes and inlets, (7) inadequate capacity at
downstream restrictions resulting in backup into the
detention easement, and (8) failure to provide an
adequate emergency storm water overflow route.

These defects, according to plaintiff, proximately caused his damages. When examining plaintiff's complaint, it is evident that the nature of the liability sought to be imposed is tort liability grounded in MCL 691.1417, not contract liability. See *In re Bradley Estate*, 494 Mich 367, 383-385; 835 NW2d 545 (2013) (explaining that the GTLA requires courts to look past the label of a claim to the nature of the liability sought to be imposed).

Defendant does not claim that plaintiff's case sounds in contract. Instead, defendant essentially argues that because it owed no duty to build a storm sewer system in the first place, once it undertakes to build one it cannot be held to owe a duty to design and build an adequate one. But the plain language of the GTLA expressly requires a governmental agency to repair any defects—including defects in the *design* of the system. In direct contrast to the limitations on liability set forth in the GTLA's public buildings exception, MCL 691.1406,[2] and the public high-

---

[2] In *Renny v Dep't of Transp*, 478 Mich 490, 500; 734 NW2d 518 (2007), our Supreme Court noted that "[t]he statutory language refers only to the governmental agency's duty to 'repair and maintain public buildings,' and does not refer to any duty to design a public building. Therefore, to hold that the language of the statute includes a design defect claim is inconsistent with its plain language." The Court further elaborated that

"[d]esign" is defined as "to conceive; invent; contrive." By contrast, "repair" means "to restore to sound condition after damage or injury." Similarly, "maintain" means "to keep up" or "to preserve." Central to the definitions of "repair" and "maintain" is the notion of restoring or returning something, in this case a public building, to a prior state or condition. *"Design" refers to the initial conception of the building, rather than its restoration. "Design" and "repair and maintain," then, are unmistakably disparate concepts*, and the Legislature's sole use of "repair and maintain" unambiguously indicates that it did not intend to include design defect claims within the scope of the public building exception. [*Id*. at 500-501 (emphasis added) (citations omitted).]

way exception, MCL 691.1402(1),[3] wherein the Legislature did not include design defects among the exceptions for which a governmental agency may be held liable, the GTLA *expressly* holds governmental agencies accountable for design defects. MCL 691.1416(e), which defines the language used in MCL 691.1417 to MCL 691.1419, defines the word "defect" to mean "a construction, *design*, maintenance, operation, or repair defect."[4] (Emphasis added.) For purposes of MCL 691.1416(e), this Court has determined that a "defect" means " 'a fault or shortcoming; imperfection.' " *Willett*, 271 Mich App at 51, quoting *Random House Webster's College Dictionary* (1997).

Here, plaintiff alleges shortcomings in the storm sewer's design and construction, and the GTLA expressly provides a cause of action for such claims. MCL 691.1417. See also *Bosanic*, 277 Mich App at 283 ("[MCL 691.1417(3)] clearly provides that a 'claimant may seek compensation' if the listed requirements are satisfied. In sum, while some semantic challenges may exist, it is difficult to imagine a statutory scheme that more clearly provides a potential cause of action."). When the Legislature has made the policy choice to provide a theory of recovery in cases involving design defects in sewage disposal systems, this Court should not second-guess that decision. *Wells Fargo Bank, NA v Cherryland Mall Ltd Partnership (On Remand)*, 300

---

[3] In *Hanson v Mecosta Co Rd Comm'rs*, 465 Mich 492, 501-502; 638 NW2d 396 (2002), the Supreme Court noted that "[n]owhere in the statutory language is there a duty to *install*, to *construct* or to correct what may be perceived as a dangerous or defective '*design*.' Moreover, it is not the province of this Court to make policy judgments or to protect against anomalous results."

[4] The Legislature's decision to include design defects among those that a governmental agency must timely remedy or repair may be due to the fact that a defect in a sewage disposal system that is bad enough to cause damage to people or property, aside from being disgusting, can have serious health consequences to a significant number of people.

Mich App 361, 376; 835 NW2d 593 (2013) ("[T]he Legislature possesses superior tools and means for gathering facts, data, and opinion and assessing the will of the public") (quotation marks and citations omitted). Put simply, defendant's argument that it owed no duty to build a storm sewer system in the first place and, thus, it should not owe any duty to repair design defects in the system it builds, flies in the face of the plain language of the GTLA.

Defendant also argues that it does not owe plaintiff a duty under the GTLA because the GTLA does not impose a duty on defendant to remove all naturally collecting surface water and rainwater from private property. I agree that the GTLA does not impose such a duty on defendant. And so does plaintiff, because this is not the duty that plaintiff is alleging, expressly or implicitly. Indeed, plaintiff expressly states the following in his brief on appeal:

> There is no general duty "to capture all storm water run-off from private property" and Plaintiff has not alleged one. Liability arises when a public storm sewer has a defect, the City has notice of the defect, the City fails to take reasonable steps to correct the defect, and the defect causes the plaintiff's damages. MCL 691.1417(3)....
> [T]here is no need to consider abstract notions of "duty" that have not been alleged.

Although defendant does not have a general duty to remove naturally collecting surface water and rainwater from private property, it is well established that a duty may be imposed on a defendant that "voluntarily assumed a function that it was under no legal obligation to assume." *Baker v Arbor Drugs, Inc*, 215 Mich App 198, 205; 544 NW2d 727 (1996). In this case, defendant voluntarily undertook to construct, assess the residents for, become the operator of, and

exert jurisdiction and control over the relief storm sewer system, which is a sewage disposal system under the GTLA. The documentary evidence submitted to the trial court illustrates that defendant implemented the relief storm sewer system to alleviate significant flooding, including basement flooding, by being able to accommodate a 10-year, 24-hour storm event. Because defendant voluntarily assumed this function, it had a duty under the GTLA to take reasonable steps in a reasonable amount of time to repair, correct, or remedy a known defect in the system or a defect in the system that it should have known of through the exercise of reasonable diligence. See MCL 691.1417(3). Defendant's failure to timely correct any known design or construction defects in the system exposed it to liability according to the plain language of the GTLA.

To the extent that the majority questions the applicability of the GTLA to sewage disposal events involving rainwater, I respectfully disagree. The majority suggests that defendant's storm sewer is not a sewage disposal system under the plain language of MCL 691.1416(j), which provides as follows:

"Sewage disposal system" means all interceptor sewers, *storm sewers*, sanitary sewers, combined sanitary and storm sewers, sewage treatment plants, and all other plants, works, instrumentalities, and properties used or useful in connection with the collection, treatment, and disposal of sewage and industrial wastes, *and includes a storm water drain system under the jurisdiction and control of a governmental agency*. [Emphasis added.]

The majority construes the phrase "used or useful in connection with the collection, treatment, and disposal of sewage and industrial wastes" as modifying all the types of sewers and systems listed in MCL 691.1416(j).

Thus, the majority opines that an appropriate governmental agency only has a duty to repair, correct, or remedy defects in disposal systems that handle the collection, treatment, and disposal of sewage and industrial wastes. However, this Court has previously held, in a case involving flooding after heavy rainfall, that a "sewage disposal system" under the GTLA is not limited to instrumentalities dealing with sewage or waste matter. *Linton*, 273 Mich App at 121. Even if the majority were correct in construing the phrase "used or useful in connection with the collection, treatment, and disposal of sewage and industrial wastes" as modifying all the types of sewers listed before it, it fails to account for critical language in the remainder of the statute; MCL 691.1416(j) specifically includes "a storm water drain system under the jurisdiction and control of a governmental agency" within the meaning of a sewage disposal system. The phrase "used or useful in connection with the collection, treatment, and disposal of sewage and industrial wastes" does not modify this later inclusion of a storm water drain system. A storm water drain system undoubtedly serves events involving rainwater; after all, storm water is rainwater; and, thus, the GTLA applies to events involving rainwater. Had the Legislature not wanted the GTLA exception to apply to rainwater, it would not have included the words "storm water" in the statute. As this Court explained in *Linton*, 273 Mich App at 116, "if the Legislature had intended that the exception only apply to sewage, then it would . . . not have made a point of specifically clarifying that the exception applies to 'a *storm water* drain system.' " To interpret the statute otherwise would render nugatory the phrase "*and includes a storm water drain system.*" Defendant's relief storm sewer system is "a storm water drain system under the

jurisdiction and control of a governmental agency" and, thus, it is a sewage disposal system. MCL 691.1416(j).

### B. PLAINTIFF HAS PRESENTED EVIDENCE TO EITHER ESTABLISH OR CREATE GENUINE ISSUES OF MATERIAL FACT CONCERNING THE ELEMENTS SET FORTH IN MCL 691.1417(3)(a) THROUGH (e)

Upon review of the evidence presented in this case, I would find that plaintiff has produced sufficient evidence to either establish or create genuine issues of material fact with regard to the elements set forth in MCL 691.1417(3)(a) through (e), which, if met, would entitle plaintiff to recovery.

#### 1. MCL 691.1417(3)(a), APPROPRIATE GOVERNMENTAL AGENCY

As already noted, MCL 691.1417(3)(a) requires plaintiff to establish that defendant was "an appropriate governmental agency." Defendant argues that it is not "an appropriate governmental agency" for purposes of MCL 691.1417. I disagree.

The Legislature defined the phrase "appropriate governmental agency" to mean "a governmental agency that, at the time of a sewage disposal system event, owned or operated . . . the portion of the sewage disposal system that allegedly caused damage or physical injury." MCL 691.1416(b). MCL 691.1416(j) defines a "sewage disposal system" to include "storm sewers" and "a storm water drain system under the jurisdiction and control of a governmental agency."

In this case, plaintiff alleges that the relief storm sewer system caused damage to his home during the June 2010 storm because the system was defective. The relief storm sewer system is a storm water drain system. See MCL 691.1416(j). There is evidence demonstrating that the relief storm sewer system is owned or

operated by and under the jurisdiction and control of defendant. MCL 691.1416(b); MCL 691.1416(j). Specifically, the pleadings and documentary evidence demonstrate that defendant commissioned the relief storm sewer study in 1989, constructed it in approximately 1991, and funded the construction through special assessments and improvement charges on its residents. A map submitted to the trial court by defendant indicates that the relief storm sewer system is a public storm main. Defendant admitted in interrogatories that it maintains, repairs, and cleans the system, and there was evidence identifying the system as being under defendant's jurisdiction and control.

Defendant contends that it is not an "appropriate governmental agency" because there is no record evidence that the flooding of plaintiff's basement was caused by an overflow of the relief storm sewer. This contention lacks merit. MCL 691.1416(b) includes as an appropriate governmental agency one that owned or operated a sewage disposal system that "allegedly" caused damage. Plaintiff's complaint alleges that the relief storm sewer system caused damage to his home during the June 2010 storm; thus, defendant is an "appropriate governmental agency" under the facts of this case.[5]

2. MCL 691.1417(3)(b), (c), AND (d), DEFECT IN SEWAGE DISPOSAL SYSTEM ABOUT WHICH DEFENDANT EITHER KNEW OR SHOULD HAVE KNOWN AND THAT DEFENDANT FAILED TO TAKE REASONABLE STEPS IN A REASONABLE AMOUNT OF TIME TO REPAIR, CORRECT, OR REMEDY

Subdivisions (b) through (d) of MCL 691.1417(3) collectively prescribe the duty imposed on governmental agencies when a defect exists in one of their sewage

_____

[5] To the extent that defendant's argument challenges causation, that argument is relevant to MCL 691.1417(3)(e), discussed later in this opinion.

disposal systems. Specifically, a governmental agency that owns or operates a sewage disposal system must take reasonable steps in a reasonable amount of time to repair, correct, or remedy a defect in the system that the agency either knew about or should have known about through the exercise of reasonable diligence.

Here, as noted already, plaintiff identified a host of defects in defendant's storm sewer, including (1) inadequate design capacity for regularly recurring peak flows leading to recurring collection of storm water outside the detention easement, (2) inadequate inlet capacity resulting in storm water backup and surface pooling, (3) drainage into the storm sewer from areas outside of the planned drainage area (including runoff from upstream development), (4) failure to increase capacity in response to increased load from upstream development, (5) inadequate or defective upstream detention, (6) misalignment in pipes and inlets, (7) inadequate capacity at downstream restrictions resulting in backup into the detention easement, and (8) failure to provide an adequate emergency storm water overflow route. In support of his defect claims, plaintiff submitted evidence from Clif Seiber and Mark Pribak, civil engineers, and John and Nancy Yalonen, plaintiff's neighbors.

Seiber testified that the relief system was designed to accommodate a 10-year, 24-hour storm event, but that the system failed to do so during the June 2010 storm. He opined that unless something was wrong with the system's design, the amount of rainfall should not have caused flooding. Seiber identified several specific defects in the relief storm sewer system, including undercapacity catch basin covers and undersized piping. He explained that upstream water could not enter the relief storm sewer in sufficient rate flows. There was not capacity for 23 acres of runoff. He opined that the catch basin covers

restricted inlet capacity. And he explained that the design for the relief system included errors in the calculation of upstream runoff. Pribak testified specifically that the design of the relief sewer erroneously assumed a 4.4 cubic feet per second (cfs) peak flow for a 10-year, 24-hour storm, but that the actual expected peak rate of upstream flow is 35.7 cfs. Nancy Yalonen testified that defendant told her that the installation of the relief storm sewer system would "take care of your issue," i.e., take care of the flooding problem.[6] Yet the Yalonens testified that they received no benefit from the relief system that they paid for through a special assessment—according to Nancy, "it never made things better."

In addition, plaintiff presented evidence that defendant knew or should have known about the defect in the relief storm sewer system. See MCL 691.1417(3)(c) (requiring the plaintiff to prove that the governmental agency "knew, or in the exercise of reasonable diligence should have known, about the defect"). Notably, plaintiff's neighbors testified that they repeatedly notified defendant, over an eight-year period, of severe flooding in the area. In addition, Seiber opined that, based on the persistent flooding, defendant should have known about serious design defects. Pribak, who was defendant's expert witness, agreed that the repeated flooding "raises some indication that there's something different going on with the system" and that it was fair to say that the repeated flooding indicated a problem.

Supporting defendant's position that the relief storm sewer system did not contain a defect, Cresson Slotten, the manager of defendant's systems planning

---

[6] Additionally, Cresson Slotten, the manager of defendant's systems planning unit, testified that the relief storm sewer system was implemented in response to basement flooding and that the system was intended to alleviate flooding.

unit, testified that he was involved in the construc-
tion of the relief system and that he was not aware
that it had any problems or that it was not operating
as designed. Similarly, Gerald Hancock, defendant's
storm water and floodplain programs coordinator,
testified that he was not aware of any defects in the
relief system. He also was not aware that the system
could not handle the flow of northerly water from
upstream. Hancock explained that the relief system
was designed to handle a 10-year, 24-hour storm
event. He testified that the June 2010 storm leading
to the damage of plaintiff's home was less than a
10-year storm event over the course of 24 hours.
Suggesting an explanation for why the relief system
did not accommodate the June 2010 storm despite
being designed to handle a 10-year, 24-hour storm
event, Hancock explained that there were peaks
during the storm that exceeded a 10-year storm
event.

In light of this documentary evidence, I would find
that reasonable minds could differ regarding whether
the relief storm sewer system contained a fault,
shortcoming, or imperfection, i.e., a defect, in design,
particularly inadequate piping and inlet capacity, and
whether defendant knew or should have known about
such a defect. See MCL 691.1417(3); MCL
691.1416(e); *Willett*, 271 Mich App at 51. It is undis-
puted that nothing was done to repair the system or
remedy the problem before plaintiff's flooding inci-
dent. Therefore, I would conclude that the trial court
properly denied defendant's motion for summary
disposition with regard to whether plaintiff submit-
ted enough evidence to satisfy the elements set forth
in MCL 691.1417(3)(b) though (d). See *West v Gen
Motors Corp*, 469 Mich 177, 183; 665 NW2d 468
(2003).

3. MCL 691.1417(3)(e), DEFECT AS A SUBSTANTIAL PROXIMATE
     CAUSE OF THE EVENT AND PROPERTY DAMAGE

Although the trial court determined causation to be a genuine issue of material fact and defendant does not raise this issue on appeal, the majority concludes that there is no evidence of causation. The GTLA requires that the defect in the sewage disposal system be "a substantial proximate cause of the event and the property damage or physical injury." MCL 691.1417(3)(e). The GTLA defines a "substantial proximate cause" as "a proximate cause that was 50% or more of the cause of the event and the property damage or physical injury."[7] MCL 691.1416(*l*). Causation is generally a question for the trier of fact. *Holton v A+ Ins Assoc, Inc*, 255 Mich App 318, 326; 661 NW2d 248 (2003).

Here, plaintiff produced documentary evidence of an accumulation of storm water onto his property that was caused by inadequate piping and inlet capacity, i.e., defects in the storm sewer. Seiber opined that had the defects in the relief system not been present, the relief system would have adequately accommodated the storm event that caused plaintiff's flooding. Seiber opined that the predominant cause of plaintiff's flooding was the inadequate design of the relief storm sewer system. And he stated that he had a reasonable degree of professional certainty that the defects in the system were 50% or more of the cause of the flooding and damage. Defendant built the relief storm sewer system in response to flooding at Chaucer Court. And the documentary evidence illustrates that the system was intended to accommodate a 10-year, 24-hour storm event. It is undisputed that the June 2010 storm was less than a 10-year, 24-hour storm event. Thus, the

---

[7] Generally, proof of causation requires both cause in fact and proximate cause. *Haliw v Sterling Hts*, 464 Mich 297, 310; 627 NW2d 581 (2001).

evidence supports the conclusion that the June 2010 storm was reasonably foreseeable. An intervening cause is not a superseding cause if it was reasonably foreseeable. *McMillian v Vliet*, 422 Mich 570, 576; 374 NW2d 679 (1985). Given the evidence in this case, I would conclude that whether the defect in the relief storm sewer system was a proximate cause that was 50% or more of the cause of the sewage disposal system event and plaintiff's basement flooding, see MCL 691.1416(*l*), is a question for a jury to consider along with the fact that plaintiff built the basement window in an area with both a storm water detention basin and a history of flooding. Accordingly, I would conclude that the trial court properly denied defendant's motion for summary disposition on the basis that causation was a genuine issue of material fact.

### C. MCL 691.1417(2), SEWAGE DISPOSAL SYSTEM EVENT

Finally, although not addressed by the majority, I note that defendant raises the additional, unpreserved argument that plaintiff's flooding was not the result of a "sewage disposal system event" under MCL 691.1417. See, generally, *In re Smith Trust*, 274 Mich App 283, 285; 731 NW2d 810 (2007) ("Because this argument was not raised in the trial court, it is not preserved."). Because this issue is unpreserved, I would decline to address it. See, generally, *Wiggins v City of Burton*, 291 Mich App 532, 574; 805 NW2d 517 (2011) ("We decline to address this issue for the first time on appeal."); *Bombalski v Auto Club Ins Ass'n*, 247 Mich App 536, 546; 637 NW2d 251 (2001) ("We decline to address this unpreserved issue, which the trial court did not expressly consider."). However, in the event this Court were to exercise its discretion to overlook the preservation requirements and review this issue, see, generally,

*Smith v Foerster-Bolser Constr, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006), I would conclude that defendant's argument lacks merit.

A "sewage disposal system event," or simply an "event" as referred to in MCL 691.1417, "means the overflow or backup of a sewage disposal system onto real property." MCL 691.1416(k). The statute does not define the terms "overflow" or "backup." Therefore, this Court may refer to a dictionary to ascertain their plain meaning. See *Willett*, 271 Mich App at 51. See also *Coventry Parkhomes Condo Ass'n v Fed Nat'l Mtg Ass'n*, 298 Mich App 252, 259; 827 NW2d 379 (2012). "Overflow" is defined as "to flow or run over, as rivers or water," "to have the contents flowing over or spilling," "flood; inundate," "to flow over the edge or brim of," "something that flows or runs over," and "a portion crowded out of an overfilled place." *Random House Webster's College Dictionary* (2005). "Backup" means "an accumulation due to stoppage." *Id.*

In this case, Seiber concluded that upstream water could not enter the relief storm sewer system in sufficient rate flows because of inadequate design of the capacity of the inlets and piping. Seiber noted that there were errors in the calculation of upstream runoff during the system's design. During his deposition, Arthur Herold, another one of plaintiff's neighbors, described the flow of upstream water to the two relief storm sewer drains (beehives) on his property:

> *Q.* Now based on what you are saying, fair to say that when [the upstream water] hits your property it doesn't all go into that intake drain?
>
> *A.* My experience is that very little of it goes into the intake drain.

\* \* \*

*A.* [A]nd so what happens is that the water hits the [first] drain, then as it can't go down in and more and more water collects it starts going on either side of the drain and over the drain until finally it's several feet on either side of the drain and the drain itself is buried under rushing water by several feet and then there is usually a huge vortex going on.

\* \* \*

*A.* [B]y the time the water hits that second beehive very, very little of it, in fact, there is never a vortex there. Very, very little of it actually goes into that system because the system is maxed out at that point. In other words, it has taken all the water it can get. There is no reserve left over once the water that starts at the beginning of it enters into that pipe at the first beehive. So by the time that water rushed down and around the property and gets to the second beehive there is very little capacity for that system . . . . And so that beehive never really exhibits that real profound entry sucking, vortex kind of thing happening in the first one.

*Q.* And you are referring to the second?

*A.* The second beehive.

*Q.* The one that's basically downstream of the water flow.

*A.* Yeah, the pipe is filled is how it has been described.

*Q.* How is it filled at that point if the water wasn't getting in at the first beehive?

*A.* Maybe I said this clumsily. Water enters into the beginning beehive, whatever water and it's continually entering in, that's the vortex.

*Q.* Yes.

*A.* Whatever water cannot enter in through that action goes over the beehive and then starts the aboveground process.

\* \* \*

*A.* So it's sort of like it's a pipe that comes around which is already filled by this first action. By the time it gets [near] the second beehive there is not like not [sic] much capacity to drop more water into that system since the piping is already filled.

This documentary evidence illustrates that there was a "backup" of the relief storm sewer system, i.e., an accumulation of water onto real property because of a stoppage of the system, and, thus, a "sewage disposal system event" for purposes of MCL 691.1417. See MCL 691.1416(k). Specifically, there was a stoppage of storm-water intake into the relief storm sewer system because of the inadequate capacity of the system's inlets and piping, and the stoppage caused an accumulation of storm water. Therefore, defendant's unpreserved argument that plaintiff's flooding was not the result of a "sewage disposal system event" lacks merit.

For the reasons provided in this dissenting opinion, I would affirm the trial court's order denying defendant's motion for summary disposition under MCR 2.116(C)(7).